T.C. Memo. 1996-133


UNITED STATES TAX COURT


THEODORE A. ANDROS AND JOAN B. ANDROS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 28208-89.                    Filed March 18, 1996.


<u>Stewart Allen Smith</u>, for petitioners.

<u>Lawrence Davidow</u> and <u>Roland Barral</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, <u>Judge</u>:    Respondent  determined  deficiencies  in
petitioners'  Federal  income  taxes  for  1976  and  1980  in  the

respective amounts of $983,966.13 and $2,338.90, and additional interest for 1980 pursuant to section 6621(c).[1]

Pursuant to an amended answer, respondent asserts that petitioners are liable for additional interest for 1976 pursuant to section 6621(c), and additions to tax for 1976 and 1980 pursuant to section 6653(a) in the respective amounts of $49,198 and $117.

This case involves petitioner Theodore A. Andros' investment in an options-spreads and futures-trading partnership, Tandrill Associates (Tandrill). It is part of the Arbitrage Management tax litigation project. The deficiencies result from respondent's disallowance of Theodore A. Andros' allocable share of partnership losses from: (1) 1979 option spread transactions involving Government securities, and (2) 1979 and 1980 futures transactions involving commodities and Government securities. The deficiency for 1976 results from respondent's reduction in petitioners' net operating loss carryback to that year from 1979.

The issues for decision are: (1) Whether respondent properly disallowed petitioners' allocable share of Tandrill's losses for 1979 and 1980, pursuant to section 165(c)(2); the resolution of this issue turns on whether the underlying partnership transactions

---

[1]    Pursuant to the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1151(c)(1), 100 Stat. 2744, former sec. 6621(d) was redesignated as sec. 6621(c).
    Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

were entered into primarily for profit; (2) whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations for 1976 and 1980; and (3) whether petitioners are liable for additional interest for 1976 and 1980.

We find that the underlying options-spreads and futures-trading transactions by Tandrill were not entered into primarily for profit, and we therefore hold that respondent properly disallowed petitioners' allocable share of Tandrill's losses for 1979 and 1980. We further hold that petitioners are not liable for additions to tax for negligence or intentional disregard of rules or regulations for 1976 and 1980, but that they are liable for additional interest for 1976 and 1980.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulations of facts and the attached exhibits are incorporated herein by this reference.

Background

Petitioners, husband and wife, resided in Key Biscayne, Florida, at the time they filed their petition. They filed joint Federal income tax returns for all relevant years. In April 1980, petitioners filed a Form 1045, Application for Tentative Refund, claiming that they were entitled to a net operating loss carryback of $1,766,137 from 1979 to 1976.

Joan B. Andros is involved in this case by virtue of having filed joint Federal income tax returns with her husband, Theodore

A. Andros. Unless otherwise specified, the term "petitioner" refers to Theodore A. Andros.

Petitioner received a B.A. in economics and psychology from the University of Nebraska in 1950. He thereafter entered the U.S. armed services and received the equivalent of an electronics engineering degree.

Petitioner is an experienced and sophisticated businessman. He has a basic knowledge of tax law. Petitioner understands the beneficial treatment accorded to capital gains and knows that excess losses in 1 year can be carried back to the 3 prior years.

Hy-Gain Electronics Corp.

Petitioner was one of the founders of Hy-Gain Electronics Corp. (Hy-Gain). Hy-Gain manufactured communications equipment. From 1972 through 1976, petitioner was the executive vice president as well as a director and shareholder of Hy-Gain. His brother, Andrew Andros, was Hy-Gain's president.

On March 19, 1976, petitioner sold his shares of Hy-Gain stock for $3.6 million. He realized a $3,492,989 long-term capital gain from the sale.

Real Estate Transactions

Upon leaving Hy-Gain, petitioner became involved in real estate transactions, including condominium conversions. By 1979, he was involved in commercial real estate consulting. He also had investments in other business enterprises.

Richard Illingworth

Petitioner first met Richard Illingworth at a social gathering in Miami in late 1977 or early 1978. Petitioner informed Mr. Illingworth that he was looking for investment opportunities. In that regard, Mr. Illingworth explained to petitioner how he could benefit from trading in commodity futures as well as option spreads involving Government securities. They discussed the possibility of forming a partnership that would engage in the trading of option spreads and commodity futures.

Mr. Illingworth was educated in England and in the late 1960's entered the commodities business. He first worked at the London Metal Exchange for the Rudolf Wolff Co., a London metal broker and commodity trader. In 1971, he moved to the United States, where he was employed by C. Tennant Sons & Co., a metals and futures trading company. Two years later, Mr. Illingworth moved to ICC Metals (a division of International Chemical Corp.) where he traded in copper and other metals. Subsequently, he worked for Gill & Duffus under a trader named Herbert Weiss.

In 1977, Mr. Illingworth formed Manhattan Metals (Nonferrous) Ltd. (Manhattan Metals), a New York corporation, involved in physical commodities and futures trading. He was the largest Manhattan Metals shareholder and had a controlling interest.[2] Mr.

---

[2] The remaining stock was owned by Mr. Illingworth's
(continued...)

Illingworth's goal was to build Manhattan Metals into a commission merchant that would compete with Merrill Lynch.

Initially, Manhattan Metals brokered relatively small transactions in metals, including copper. Manhattan Metals then expanded its operations to include trading in the futures markets, primarily in copper, gold, and silver.

By 1980, Manhattan Metals had seven employees, including two traders--Mr. Illingworth and Herbert Weiss. Mr. Weiss was the main trader for Manhattan Metals. He was authorized to make trades without discussing them with Mr. Illingworth. One of Mr. Weiss' responsibilities was to evaluate the prices that were being paid by Manhattan Metals for option spreads.

Mr. Illingworth held seats on the New York Mercantile Exchange and the New York Futures Exchange. Mr. Weiss was a member of the Commodities Exchange, Inc. (COMEX). Manhattan Metals was not a member of any exchange.

In addition to Manhattan Metals, Mr. Illingworth was a partner in several partnerships that were involved in option spreads and commodities trading activities.

Petitioner's Investigation of Mr. Illingworth

In considering the possibility of entering into an investment relationship with Mr. Illingworth, petitioner engaged attorneys at

---

[2](...continued)
then wife and a third-party investor.

the Miami law firm of Paul & Thomson, accountants at Peat Marwick, and a private investigator to investigate Mr. Illingworth's background. The reports petitioner received confirmed what Mr. Illingworth had stated to be his background and convinced petitioner that Mr. Illingworth had expertise in commodities trading.

Petitioner also consulted with accountants at Peat Marwick regarding the tax ramifications of establishing and operating a partnership with Mr. Illingworth.

Trading Terminology

Trading in commodity futures contracts involves tremendous leverage and thus the potential for large gains or losses. A "futures" contract is a forward instrument (having a long side and a short side) with respect to an underlying commodity. The contract represents a commitment to deliver (sell) or receive (buy) a specified quantity of a commodity at a specified price at a specified date in the future. At the expiration of the specified time (which is referred to by the specified month), a trader holding a short futures contract (a contract to sell the commodity) must deliver the underlying commodity to the holder of the corresponding long contract at the specified price. A trader holding a long futures contract (a contract to buy the commodity) can compel the holder of the corresponding short contract to deliver the underlying commodity. Less than 5 percent of all

futures contracts actually result in delivery of the underlying commodity; most are offset. Futures contracts involving sales and purchases of commodities are regulated by the Commodity Futures Trading Commission through the Commodity Exchange Act.

A securities option is the right to buy or sell an underlying security at a specific price (the "strike price") and a specified time (the expiration date). There are two types of options: "Call" options and "put" options. In a call option, the grantor (or seller) of the option is required, if the buyer so desires, to sell the underlying security to the buyer at the strike price on the expiration date. The buyer of a call option has the right to "call" the security from the seller. The buyer is "bullish" on the underlying security; he is betting that the market price of the underlying security will rise above the strike price. If that happens, the option buyer will purchase the security on the expiration date at the strike price, which will be less than the current market price. With a put option, the grantor (or seller) of the option is required, if the buyer so desires, to purchase at the expiration date the underlying security put to him by the buyer at the strike price. In this latter case, the buyer is "bearish" on the underlying security. He is betting that the market price of the underlying security will fall below the strike price by the expiration date. In that case, he will "put" the security to the option writer, who must pay the higher strike price.

The price of an option, or its "premium", is composed of two elements: The option's "intrinsic value" and its "time value". For a call option, the intrinsic value of the option is the amount, if any, by which the price of the underlying security exceeds the option's strike price. The balance of the premium is the time value of the option. For a put option, the intrinsic value of the option is the amount, if any, by which the strike price exceeds the price of the security.

Generally, an option's price in the marketplace will be greater than its intrinsic value. The additional amount of premium beyond the intrinsic value reflects that traders are willing to pay the "time value" of money or the option's "time premium". Market participants are willing to pay this additional amount because of the protective characteristics afforded by an option over an outright long or short position in the underlying security.

An option is "in the money" when the option's strike price is less than the current market price of the underlying instrument; i.e., when it would be economically favorable for the option holder to exercise the option. An option is "out of the money" when it would be economically unfavorable to exercise the option. When the option strike price equals the market price of the underlying security, an option is "at the money".

In the futures market, a "spread" consists of the simultaneous establishment of two opposite positions for delivery of the same

commodity in different delivery months.  Such a spread consists of two "legs": One is the purchase of a commodity for delivery at a specific future date, while the other is the simultaneous sale of the same commodity for delivery at a different specified future date.  Although there are variations in spreads, all of them have a simultaneous purchase and sale.

In the options market, a "spread" (sometimes called a "straddle") is a position maintaining simultaneously both long and short options of the same type (i.e., puts or calls) or of different types in the same class. A "vertical spread" in the options market consists of purchasing an option at one strike price and simultaneously selling an option at another strike price, where the options are identical in all other respects.[3] "Vertical put spreads" are positions in which a trader has both long (purchased) puts and short (sold) puts in the same underlying asset at different strike prices for the same maturity month.  The spread is a "credit spread" when the price paid for the long position is less than the price received for the short position so that the trader's account shows a cash credit.  The trader is then considered to have "sold" the spread.  A trader is said to have "purchased" the spread (a "debit spread") when the price paid for the long position is

---

[3]     The following is a typical vertical spread:

        Buy 1 June 90 call
        Sell 1 June 95 call

less than the price received for the short position so that the trader's account shows a debit.

"Butterfly spreads" occur when a trader holds three positions in the same underlying asset in puts or calls in the same expiration month at three different strike prices, with the highest and lowest strike positions one-half the size of the middle position.[4]

A General Description of Tandrill's Trading Plan

On August 22, 1979, petitioner and Mr. Illingworth formed Tandrill, a general partnership under the laws of Florida. Tandrill is a combination of the names of its two partners: T. ANDROS and R. ILLINGWORTH. Petitioner contributed the major portion of the funding for the partnership while Mr. Illingworth agreed to conduct Tandrill's trading activity. As stated in the partnership agreement, the purpose of Tandrill was to trade in:

> commodities of every nature, foreign currencies, U.S. Treasury Bills, U.S. Treasury Bonds, GNMA Certificates[5] and other

---

[4] A "butterfly" spread is a balanced straddle position. An example of a butterfly spread in gold would involve the purchase of one contract of February gold, the short sale of two contracts for April delivery, and the purchase of one contract of June gold. If the price of gold goes up, the investor will profit on his two long contracts in February and June and lose a substantially like amount on his two short April contracts. The "butterfly" spread gets its name because it has a heavy body in the center (in this case the two April short contracts) and lighter wings on the side (in this case the one long contract each in February and June).

[5] GNMA's, sometimes referred to as "Ginnie Maes", are long-term coupon-bearing securities issued through the Government

(continued...)

> government (foreign or domestic) financial
> instruments and futures contracts and options
> with respect to the foregoing, and in
> connection therewith to use arbitrage,
> spreading, margin and other leveraging
> devices, and such other techniques deemed
> appropriate.

Petitioner contributed $300,000 to Tandrill in exchange for a 93.75-percent partnership interest; Mr. Illingworth contributed $20,000 in exchange for a 6.25-percent interest.

On the same date Tandrill was formed (August 22, 1979), Tandrill entered into a Management Agreement with Manhattan Metals, whereby it was agreed that Manhattan Metals would "manage, buy, sell, sell short, redeem and otherwise invest, reinvest and trade in commodities of every nature" on Tandrill's behalf. The Management Agreement authorized Manhattan Metals to: (1) Perform administrative functions for Tandrill; (2) employ Wilcap Advisors (Wilcap)[6] as an adviser in its trading activities; and (3) share in commissions or fees that Tandrill paid.

Tandrill paid Manhattan Metals a retainer and organization fee of $10,000 upon execution of the Management Agreement. On an ongoing basis, Tandrill was required to pay Manhattan Metals an

---

[5](...continued)
National Mortgage Association that represent undivided interests in specific pools of Government-guaranteed mortgages. Such certificates are backed by the full faith and credit of the Federal Government.

[6]     Messrs. Paul Willensky and Mark Sherman were the principals of Wilcap. Mr. Illingworth had known Messrs. Willensky and Sherman less than a year, and had not previously dealt with them, when he decided to use their company as an adviser to Manhattan Metals.

annual management fee of three-fourths of 1 percent of the aggregate value of Tandrill's investments with Manhattan Metals (including the value of commodities subject to futures contracts), the value of premiums paid for options, and cash on hand. Such fee was capped at a maximum of $50,000, or $12,500 per calendar quarter, for the period ending September 30, 1980, and at a maximum of $25,000 per year, or $6,250 per calendar quarter, thereafter.

The Management Agreement had no fixed termination date; it could be terminated on 30 days' notice by either party. The agreement provided that, if petitioner terminated the agreement before September 30, 1980, Tandrill would pay Manhattan Metals the difference between $50,000 and the sum of the quarterly fees that had been paid to Manhattan Metals for that period.

Manhattan Metals was not required to perform services exclusively for Tandrill. Petitioner understood that although Manhattan Metals would conduct Tandrill's trading activities and that Mr. Illingworth would be in charge of deciding the partnership's trading positions, Mr. Illingworth would be assisted in doing so by others. Petitioner had no interest in managing Tandrill's day-to-day trading activities; he merely wanted the right to make suggestions and review documents.

At the time that the trades were undertaken, petitioner did not understand the exact nature of Tandrill's trading activities, or the mechanics and theories of commodities trading. Although Mr. Illingworth sent petitioner periodic updates regarding Tandrill's

trading activity, petitioner did not closely monitor the trades Manhattan Metals performed for Tandrill.

Tandrill's net asset value decreased each calendar quarter during 1980.

Tandrill's Transactions

Arbitrage Management Investment Company (Arbitrage Management)[7] and Pershing & Co. (Pershing) performed brokerage services for Tandrill with respect to Treasury bill options transactions; they also made the market in which such transactions were executed. Arbitrage Management or Pershing was on the "other side" of each Treasury bill option transaction that Tandrill entered. A.C.L.I. International Commodity Services, Inc. (ACLI), and Bache Halsey Stuart Shields, Inc. (Bache), performed brokerage services for Tandrill with respect to its commodity futures trading transactions.

a. Options Transactions

The Treasury bill options transactions involved herein were cleared through Pershing and Arbitrage Management.[8] See appendices A-D for a list of Tandrill's put-option positions. Messrs. Willensky and Sherman of Wilcap handled the trades on behalf of Manhattan Metals. They made all the trading decisions with respect

---

[7] Arbitrage Management Investment Company has been involved in other cases in this Court. See, e.g., Fox v. Commissioner, 82 T.C. 1001 (1984); Manko v. Commissioner, T.C. Memo. 1995-10.

[8] Pershing and Arbitrage Management "wrote" the options comprising the spreads that Tandrill established.

to the Treasury bill options transactions, after discussing with Mr. Illingworth the "general parameters" of such trading. Wilcap decided which brokerage house would execute a particular options transaction.

The options transactions did not occur on a regulated exchange but instead were conducted over the counter.[9] Current trading prices for the option spreads, or the constituent put options, were not published daily. There was no publicly available mechanism through which a trader in Treasury bill options could ascertain the current price of his positions. No steps were taken to insure that Tandrill paid or received fair prices for its positions in Treasury bill options.

All of the options transactions that Tandrill entered into possessed the following characteristics: (1) They were part of eight "vertical put" straddles or spreads; (2) all of the spreads were opened and closed out in 1979; (3) the underlying commodities were Treasury bills; (4) when the spreads were opened, all of the puts were "in the money"; (5) all of the spreads were closed out through "offset" before the date of issuance of the underlying Treasury bills; (6) the options spreads were purchased as a unit rather than as separate legs; and (7) the spread between exercise prices varied from a minimum of .06 to a maximum of .125. None of the trade spreads was profitable.

---

[9] In 1979 there were three or four dealers who made a market in over-the-counter Treasury bill options.

Six of the options spreads were executed through Pershing. These spreads were all credit spreads, so-called because Tandrill received money or a credit to its account when it established the spreads.[10] These spreads involved the sale of put options having a higher dollar exercise price and the purchase of puts with a lower dollar exercise price. The other two options spreads were executed through Arbitrage Management. Both of these spreads were debit spreads, so-called because Tandrill paid money or suffered a debit of its account when it established the spreads. These spreads involved the sale of put options having a lower dollar exercise price and the purchase of put options having a higher dollar exercise price.

b. Futures Transactions

Tandrill's futures transactions generally had the following characteristics: (1) Most took the form of straddles or spreads; (2) Tandrill's British pound and Swiss franc futures trading took place on the International Monetary Market; (3) the Treasury bill futures trading took place on the Chicago Mercantile Exchange; (4) the Treasury bond and GNMA futures trading took place on the Chicago Board of Trade; (5) the sugar futures trading took place on the Coffee, Cocoa and Sugar Exchange; (6) the gold, silver, and copper futures trading took place on the COMEX; (7) the trading in

---

[10] Vertical spreads, like individual options, can either be purchased or sold. These spreads were sold by Tandrill.

"physical" copper took place through Manhattan Metals;[11] and (8) all of the futures positions were closed out through "offset".

In 1979 and 1980, Tandrill entered into futures transactions in gold, silver,[12] copper, and Treasury bills through Bache. With respect to these transactions: (1) The gold and silver trading began on November 1, 1979, and the copper trading began on November 14, 1979; (2) all the gold, silver, and copper futures transactions

---

[11]    Tandrill's trading in "physical" copper had the following characteristics:  (1) Delivery or receipt of the commodity was never intended and never took place; (2) all gains and losses were cleared through a "difference account"; (3) Manhattan Metals was on the other side of each transaction that Tandrill entered into; Manhattan Metals was the source of any profits and losses Tandrill realized; and (4) the "physical" copper trades did not occur on an exchange. Respondent could not determine how the "physical copper" transactions affected petitioners' or Tandrill's tax returns, and the tax consequences of these transactions are not in dispute here.

[12]    The price of silver fluctuated substantially on Nov. 21, 23, and 27, 1979.  The following chart (taken from the COMEX Statistical Yearbook for 1979) indicates the price movement and number of contracts of September 1980 silver traded each day between Nov. 15 and 27, 1979:

| Date | Price Movement | Contracts Traded |
|------|------|------|
| Nov. 15 | down 7.8 | 605 |
| Nov. 16 | up 7 | 235 |
| Nov. 19 | up 2 | 126 |
| Nov. 20 | up 3 | 80 |
| Nov. 21 | down 21 | 4,463 |
| Nov. 23 | up 31.5 | 817 |
| Nov. 26 | up 7 | 173 |
| Nov. 27 | up 40 | 4,240 |

Of the 721 silver contracts that Tandrill closed out in 1979, 718 were closed out on either Nov. 21 or 27, 1979.  On Nov. 21, 1979, Tandrill closed out 359 silver contracts by repurchasing 119 May 1980 silver contracts and 240 December 1980 silver contracts.  On Nov. 27, 1979, Tandrill closed out 359 silver contracts by repurchasing 108 March 1981 silver contracts, 75 March 1980 silver contracts, and 176 September 1980 silver contracts.

involved balanced straddles; some were butterfly spreads;[13] (3) in 1979, Tandrill, in its account with Bache, entered into 160 contracts of copper futures straddles, 330 contracts of gold futures straddles, and 1,110 contracts of silver futures straddles; (4) in 1979, Tandrill closed out by offset 100 of the copper futures contracts, 164 of the gold futures contracts, and 697 of the silver futures contracts, realizing a net loss of $1,772,139.10, including commissions; (5) every futures spread Tandrill closed out in 1979 involved the realization of a loss, with the exception of an aggregate gain of $612 realized on 20 July 1980 copper contracts; and (6) on a weighted average basis, Tandrill's 1979 silver, gold, and copper spreads were kept open an average 12.10 days.[14]

---

[13]    For example, on Nov. 26, 1979, Tandrill purchased 20 May 1980 copper contracts, sold 40 July 1980 copper contracts, and purchased 20 September 1980 copper contracts.

[14]

HOLDING PERIODS, 1979 TRADES

| DATE SOLD | DATE BOUGHT | QUANTITY | DESCRIPTION | NUMBER OF DAYS | DAYS X QUANTITY |
|---|---|---|---|---|---|
| 11/01/79 | 11/21/79 | 18 | Apr. 81 Gold | 20 | 360 |
| 11/06/79 | 11/21/79 | 146 | Apr. 81 Gold | 15 | 2,190 |
| 11/15/79 | 11/21/79 | 119 | May 80 Silver | 6 | 714 |
| 11/01/79 | 11/21/79 | 73 | Dec. 80 Silver | 20 | 1,460 |
| 11/02/79 | 11/21/79 | 79 | Dec. 80 Silver | 19 | 1,501 |
| 11/05/79 | 11/21/79 | 88 | Dec. 80 Silver | 16 | 1,408 |
| 11/15/79 | 11/27/79 | 108 | Mar. 81 Silver | 12 | 1,296 |
| 11/21/79 | 11/27/79 | 75 | Mar. 80 Silver | 6 | 450 |
| 11/21/79 | 11/27/79 | 132 | Sept. 80 Silver | 6 | 792 |
| 11/21/79 | 11/27/79 | 44 | Sept. 80 Silver | 6 | 264 |

(continued...)

Tandrill realized gains and losses in 1979 and 1980 from commodity futures transactions, with respect to which Bache was the broker, in the following amounts:

| Commodity | Net Gain/Loss 1979 | Net Gain/Loss 1980 |
|---|---|---|
| Silver | ($1,402,729.30) | $738,631.30 |
| Gold | ( 264,033.00) | 207,874.60 |
| T-Bill futures | 199,502.00 | (44,448.80) |
| Copper | ( 105,440.00) | (35,821.10) |
| Other | --- | (16,940.90) |
| Total | (1,572,700.30) | 849,295.10 |

In 1980, Tandrill entered into futures transactions in copper, gold, sugar, Treasury bills, Treasury bonds, and GNMA's through ACLI. Tandrill realized $749,143.50 in net losses with respect to the commodity futures transactions. For example, on June 26-27, 1980, Tandrill entered into a "spread of a spread" involving GNMA and Treasury bond contracts: (a) It purchased 30 March 1981 GNMA contracts and sold 30 September 1981 GNMA contracts; and (b) it purchased 30 September 1981 Treasury bond contracts and sold 30

---

[14](...continued)

| | | | | | |
|---|---|---|---|---|---|
| 11/27/79 | 12/26/79 | 3 | Dec. 80 Silver | 29 | 87 |
| 11/14/79 | 11/21/79 | 10 | Mar. 80 Copper | 7 | 70 |
| 11/14/79 | 11/23/79 | 10 | Mar. 80 Copper | 9 | 90 |
| 11/21/79 | 12/03/79 | 10 | July 80 Copper | 12 | 120 |
| 11/23/79 | 12/03/79 | 10 | July 80 Copper | 10 | 100 |
| 11/26/79 | 12/13/79 | 20 | July 80 Copper | 17 | 340 |
| 11/26/79 | 12/19/79 | 20 | July 80 Copper | 23 | 460 |
| 11/26/79 | 12/07/79 | 20 | Sept. 80 Copper | 11 | 220 |
| **TOTALS** | | **985** | | | **11,922** |

Average days per transaction          13.56
Average days per contract (11,922/985)  12.10

March 1981 Treasury bond contracts.  On October 28, 1980, Tandrill entered into another "spread of a spread" involving GNMA and Treasury bond contracts: (a) It purchased 30 June 1981 GNMA contracts and sold 30 March 1981 GNMA contracts; and (b) it purchased 30 June 1981 Treasury bond contracts and sold 30 September 1981 Treasury bond contracts. The October 1980 transactions resulted in a $327,030 loss on the GNMA contracts and a $368,280 loss on the Treasury bond contracts. This left Tandrill with unrealized profits of $691,406.25 in its open positions. Tandrill's open positions were liquidated in 1981.

Tandrill's Liquidation

Tandrill ceased operations in 1981; at this time, its capital had dwindled to approximately $10,000. Petitioner received only one distribution from Tandrill, in the amount of $9,782, which represented his proportionate share of Tandrill's net assets on the 1981 liquidation date.

Tandrill's Forms 1065

Peat Marwick's New York office prepared Tandrill's partnership returns (Forms 1065) for 1979 and 1980.[15]

a.  1979

On its 1979 partnership return, Tandrill reported an ordinary loss of $1,858,743 on Treasury bill options and claimed deductions

---

[15]    Petitioners introduced into the record Tandrill's 1979 and 1980 yearend financial statements. However, they failed to present evidence proving the reliability of such documents.  We have therefore not utilized these statements in making our determination.

for a management fee and accounting fee of $22,500 and $270, respectively. These ordinary losses arose from purchased put options on Treasury bills. Each of Tandrill's purchased put options was closed out at a loss in 1979.

Tandrill also reported short-term capital gains of $163,666 on this return, computed as the excess of short-term gains of $1,736,366 over short-term losses of $1,572,700. The $1,736,366 in short-term capital gains arose from the sale of put options on Treasury bills. The $1,572,700 in short-term capital losses arose from futures transactions in gold, silver, copper, and Treasury bills.

### b. 1980

On its 1980 partnership return, Tandrill reported an ordinary loss of $19,428 on Treasury bill futures transactions, interest income of $36,065, and deductions for a management fee and accounting fee of $43,750 and $9,700, respectively. Tandrill also reported short-term capital losses of $918,244 and long-term capital gains of $1,509,077. Both the short-term capital losses and long-term capital gains arose from commodity futures transactions.

## Petitioners' 1979 and 1980 Federal Income Tax Returns

Peat Marwick's Miami office prepared petitioners' returns for both years in issue. Petitioner provided Peat Marwick with his tax information and copies of his 1979 and 1980 Schedules K-1 from Tandrill for use in Peat Marwick's preparation of petitioners' 1979 and 1980 returns.

Petitioners reported the following amounts of income and loss on their 1979 and 1980 returns with respect to petitioner's investment in Tandrill:

| Year | Income (Loss) | Short-Term Capital Gain (Loss) | Long-Term Capital Gain |
|------|------|------|------|
| 1979 | ($1,758,908) | $153,437 | --- |
| 1980 | (34,512) | (860,854) | $1,414,760 |

In April 1980, petitioners filed a Form 1045, Application for Tentative Refund, claiming entitlement to a net operating loss carryback of $1,766,137 from 1979 to 1976.

Notice of Deficiency

In the notice of deficiency, respondent disallowed petitioners' allocable share of losses arising from Tandrill's transactions on the premise that no profit motive existed with respect to the transactions.[16] Respondent determined the following corrected amounts of income and loss petitioner realized through his investment in Tandrill:

| Year | Income (Loss) | Short-Term Capital Gain | Long-Term Capital Gain |
|------|------|------|------|
| 1979 | $5,010 | --- | --- |
| 1980 | 33,811 | --- | --- |

---

[16] Respondent also determined that "the transactions at issue were either shams or devoid of the substance necessary for recognition for federal income tax purposes." Respondent's amended answer reiterated this position. However, at trial, respondent's counsel informed the Court that the only issue for decision in this regard is whether Tandrill entered into the transactions at issue primarily for profit. We therefore will assume that Tandrill's transactions were not shams.

Accordingly, the adjustments respondent made in the notice of deficiency increased (decreased) petitioners' income and loss items as follows:

| Year | Income (Loss) | Short-Term Capital Gain | Long-Term Capital Gain |
|------|---------------|-------------------------|------------------------|
| 1979 | $1,763,918 | ($153,437) | --- |
| 1980 | 68,323 | 860,854 | ($1,414,760) |

The adjustment to petitioners' 1979 income results in a reduction of petitioners' net operating loss carryback to 1976 from $1,766,137 to $146,279, and an increase of $1,619,858 in taxable income for 1976. The disallowed deductions arose from Tandrill's transactions involving Treasury bill option spreads and commodity futures.[17]

OPINION

Issue 1. Tandrill Losses

The first issue for decision is whether respondent properly disallowed petitioners' allocable share of Tandrill's 1979 and 1980 losses pursuant to section 165(c)(2). This issue turns on whether the underlying partnership transactions were entered into primarily for profit. Petitioners have the burden of proof in this regard. Rule 142(a).

---

[17] We note that prior to the trial in this case, the Internal Revenue Service (IRS) audited Mr. Illingworth's 1978-80 tax years, disallowing loss deductions that he had claimed relating both to Tandrill's transactions at issue herein and to other transactions involving other partnerships. The IRS determined that Tandrill's transactions had not been entered into for profit. Mr. Illingworth ultimately accepted an IRS settlement offer based on this determination.

Respondent contends that the purpose of the options transactions was to generate corresponding amounts of ordinary losses and short-term capital gains in 1979, while the purpose of the commodity futures transactions was to generate short-term capital losses in 1979 and long-term capital gains in 1980. Respondent posits that at the time the transactions were entered into, Tandrill's general partners (petitioner and Mr. Illingworth) expected to realize economic losses rather than economic profits. According to respondent, petitioner was aware that the economic consequences of the transactions entered into by Tandrill were de minimis as compared to their potential tax benefits. On the other hand, petitioners argue that the transactions at issue were entered into with both a profit motive and profit potential. We agree with respondent.

Respondent and petitioners each rely on reports and testimony of their respective experts. As the trier of fact, we must weigh the evidence presented by these experts in light of their demonstrated qualifications as well as all other credible evidence. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Chiu v. Commissioner, 84 T.C. 722, 734 (1985).

## The Parties' Experts

### Mr. Natenberg

Respondent's first expert witness, Sheldon Henry Natenberg, received a B.A. in mathematics from the University of Illinois. After working in unrelated fields for 10 years, he became an independent option trader in 1982. Mr. Natenberg is an options consultant and conducts educational seminars for traders all over the world. He has written a book, Option Volatility and Pricing Strategies, which was published in 1988 and revised in 1994. Mr. Natenberg is a member of the Chicago Board of Trade.

Mr. Natenberg's report, rebuttal report, and testimony solely addressed Tandrill's 1979 options spreads. Mr. Natenberg testified that Tandrill's options trades consisted of vertical put spreads, with all the puts being in the money. Grouping the trades by opening date and exercise price, he further testified that the trades consisted of eight different put vertical spreads. Six spreads were initially sold and later bought back, and two spreads were initially purchased and later sold out. Mr. Natenberg opined that in every one of the six spread positions initiated with the sale of a vertical put spread, the spread was sold at a price so low that a profit could be considered at best highly unlikely. He further stated that when the spread positions were closed, they then were bought back at a price greater than the maximum possible spread value. Thus, according to Mr. Natenberg, profit was not the motivation for the trades.

Mr. Natenberg testified that in closing out the spread transactions, Tandrill experienced a cash outflow. By paying more than the theoretical maximum value to close out the spreads, Tandrill reduced its overall profits (if any) or increased its overall losses. Mr. Natenberg explained that over the life of an option, the option's value will vary depending on current market conditions and the likelihood of changing conditions in the future. He referred to the Black-Scholes Model.[18] The Black-Scholes Model is a mathematical refinement of the premise that changes in value of an underlying asset are random. The Black-Scholes Model uses the laws of probability to determine the price at which an option would have to trade so that neither the buyer nor the seller of the option would show a profit in the long run.[19]

Mr. Natenberg opined that at the moment of expiration, an option can take only one of two values: Zero if it is out of the money, and intrinsic value if it is in the money. Thus, at expiration of the option it is always possible to calculate the maximum potential profit or loss resulting from any individual option trade as well as from a trade consisting of multiple options. Further, the maximum value of a put option spread is the

---

[18] The Black-Scholes Model was developed by Fisher Black and Myron Scholes in 1973. It is a tool for analyzing an option's value.

[19] The Black-Scholes Model requires five inputs in order to generate a theoretical value: Exercise price, expiration date, price of the underlying instrument, prevailing interest rate, and volatility.

difference between the exercise prices of the purchased and sold puts, and the minimum value is zero.

According to Mr. Natenberg, the amount of money or credit that Tandrill received upon the establishment of all six of its credit spreads was always substantially outside (less than) the range of values indicated by the Black-Scholes Model. In addition, the amount of money or credit that Tandrill received upon closing out the two debit spreads through Arbitrage Management was always substantially outside (less than) the range of values indicated by the Black-Scholes Model.

Mr. Natenberg analyzed Tandrill's trades based on a comparison of the trade prices with two numbers:  The maximum possible value of each vertical spread if held to expiration, and a price evaluation of each spread using the Black-Scholes Model. See appendix E for Mr. Natenberg's Trade Analysis.  Mr. Natenberg concluded that Tandrill's options trades were done at prices that "practically ensured that they would result in a loss."[20]

---

[20]    Mr. Natenberg gave as an example Tandrill's first trade, on Sept. 20, 1979, where the partnership sold the 97.50/97.625 put spread 47 times.  He stated that if the price of the underlying Treasury bill were at or below 97.50 at expiration, the spread would have a maximum value of $58,750.  If the price of the underlying Treasury bill were at or above 97.625 at expiration, the spread would be worthless.  At the time the trade was made the Treasury bill price was 97.45.  Because this price was below 97.50, there was, in Mr. Natenberg's opinion, a far greater chance for the spread to be worth at expiration its maximum value of $58,750 than its minimum value of zero.  Thus, according to Mr. Natenberg, the value of the spread should be closer to $58,750 than to zero.  Mr. Natenberg confirmed this by
(continued...)

Mr. Maduff

Respondent's other expert, Michael L. Maduff, received a B.A. in economics from the University of Iowa. Between 1965 and 1984, he was chief executive officer of Maduff & Sons, Inc., a licensed futures commission merchant and clearing member of the Chicago Mercantile Exchange. After 20 years in business, he went to law school at Northwestern University and received a J.D. in 1988. Since 1988 he has been a practicing attorney, as well as a consultant and expert witness regarding the futures industry.

Mr. Maduff's report and testimony concern Tandrill's 1979-81 commodity and futures transactions. Mr. Maduff testified that a spread in gold, silver, or copper futures is principally a speculation on interest rates rather than a speculation on the value of the metal itself.[21]

---

[20](...continued) using the Black-Scholes Model to evaluate the spread. From this analysis he determined that a reasonable value for this spread would have been somewhere between $32,638 and $50,553. But Tandrill actually sold the spread for $25,004. Even allowing for subjective judgments among different market participants, Mr. Natenberg opined that this was well below the price any knowledgeable trader would have placed on the spread.

[21] Mr. Maduff explained that in 1979 and 1980, precious metals and long-term interest rates made historic highs and experienced great volatility. While absolute prices of the metals may be volatile, the relative price for different delivery months of the same metal remained fairly constant, reflecting the cost of maintaining an inventory of the metal over time, so-called carrying costs, with interest being the major component of these carrying costs.

Mr. Maduff stated that the documentation petitioners provided concerning Tandrill's futures trading, while not complete, was sufficient for him to conclude that Tandrill in fact made trades on the futures exchanges and that those trades generally were "tax straddles with no economic objective or effect other than to move income from one year to the next with minimal market exposure and no hope of profit." He testified that while the commissions Bache and ACLI charged Tandrill do not appear on the documents provided, he was able to extrapolate the sum of commissions and fees charged from the information supplied, namely $52.70 per contract charged by Bache, and $41.50 for gold and $26.50 for copper charged by ACLI.[22]

---

[22] The charges connected with the execution of Tandrill's futures trading took two distinct forms: Broker's commissions (and associated fees) and market slippage, or the bid/ask price spread. (The bid/ask price is the difference between the prices at which floor traders are willing to buy and prices at which they are willing to sell.) After studying the Bache and ACLI monthly statements, Mr. Maduff concluded that Bache and ACLI charged commissions and associates fees on a per-contract, round-turn basis. (A per-contract basis means that the commissions and fees are the same for each contract of a particular commodity traded, without regard to the price. A round-turn basis means that no commission is charged when a position is established (whether long or short), but rather the broker waits until the position is closed out with an offsetting sale or purchase and then charges a single fee for the entire round-turn transaction.) Tandrill also paid execution costs, meaning the markup the investor pays to the floor trader every time he buys and the markdown he suffers every time he sells. Thus, commissions are paid only when a position is closed out while execution costs are encountered when an investor enters his position and again when he closes it out. The total marginal costs of a single contract include two execution costs and one commission cost.

The Bache Trades

Mr. Maduff was able to draw conclusions only with respect to Tandrill's 1979 trading through Bache because the documents that were presented regarding Tandrill's 1980 trades through Bache were incomplete.

### a. Treasury Bills

The Treasury bill trading began in September 1979 and continued through the end of the year. Mr. Maduff stated that taken in isolation, the Treasury bill trading would appear to have been undertaken with a profit motive. But, he went on to say, because Tandrill failed to provide records of other interest rate transactions it may have engaged in during the period, it is possible that, when viewed in conjunction with transactions in other brokerage accounts, the Treasury bill positions through Bache would prove to be mere hedges against these other positions and thus not reasonably likely to have resulted in net profits.

### b. Gold, Silver, and Copper Transactions

Mr. Maduff concluded that Tandrill's 1979 gold, silver, and copper transactions were not motivated by the desire to achieve an economic profit and were taken solely for tax purposes. The gold and silver trading began on November 1, 1979, and the copper trading began on November 14, 1979. Every transaction was a perfectly balanced straddle with an equal number of purchases and

sales on each day.  A few of these transactions were butterfly spreads.[23]

At times, Tandrill established positions that appeared to be regular, nonbutterfly spreads but which, on closer examination, had little risk involved.  For instance, in early November 1979, Tandrill purchased February 1981 gold contracts and sold April 1981 gold contracts, a "forward spread" which apparently anticipated that interest rates would decline.  However, at the same time Tandrill purchased January 1981 silver contracts, it sold December 1980 silver contracts, resulting in a "back spread" which sought to profit from an increase in interest rates.

In 1979, Tandrill bought and sold 160 contracts of copper futures straddles, 330 contracts of gold futures straddles, and 1,110 contracts of silver futures straddles through Bache.[24]  Of these transactions, 164 contracts of gold futures, 721 contracts of silver futures, and 100 contracts of copper futures were all

---

[23]    The butterfly effect offsets forward spreads (which are profitable if interest rates decline) with back spreads (which are profitable if interest rates increase). Mr. Maduff believes that this sort of strategy is "economically schizophrenic".

[24]    Mr. Maduff believed that because Tandrill engaged in more transactions than necessary to achieve a given economic purpose, its transactional costs were greater. Moreover, because Tandrill held positions for short periods of time, it was less likely the positions would move.

offset, resulting in losses of approximately $1,772,000, including commissions for 1979.[25]

Mr. Maduff posited that in every case, when these positions were first established, Tandrill made contrary straddle transactions in the same quantity in a different delivery month of the same futures contract. When these positions were closed out, Tandrill replaced them with a like quantity of contracts in the same futures contract but in a different delivery month, at the same time retaining into a subsequent year the profitable positions that had been established at the same time as these loss positions

---

[25]     The closed-out losing trades were as follows:

| Source No. | Date | Quantity | Description | Loss |
|---|---|---|---|---|
| 330011 | 11/23/79 | 164 | Apr. 81 gold | $264,032.80 |
| 330010 | 11/21/79 | 75 | May 80 silver | 183,837.50 |
| 330012 | 11/23/79 | 44 | May 80 silver | 104,933.80 |
| 330013 | 11/23/79 | 240 | Dec. 80 silver | 352,253.00 |
| 330014 | 11/27/79 | 108 | Mar. 81 silver | 183,026.60 |
| 330015 | 11/28/79 | 75 | Mar. 80 silver | 127,317.50 |
| 330016 | 11/28/79 | 176 | Sept. 80 silver | 313,250.20 |
| 330029 | 12/16/79 | 3 | Dec. 80 silver | 138,110.70 |
| 330019 | 11/21/79 | 10 | Mar. 80 copper | 10,819.00 |
| 330020 | 11/23/79 | 10 | Mar. 80 copper | 13,569.00 |
| 330028 | 12/3/79 | 20 | July 80 copper | 49,388.00 |
| 330028 | 12/7/79 | 20 | Sept. 80 copper | 28,138.00 |
| 330029 | 12/18/79 | 20 | July 80 copper | (612.00) |
| 330029 | 12/19/79 | 20 | July 80 copper | 4,138.00 |

had been established.[26] In sum, Mr. Maduff concluded that these trades clearly were not motivated by the desire to make a profit.

The ACLI Trades

Tandrill did not enter into any transactions through ACLI during 1979. Tandrill's 1980 transactions established through ACLI

---

[26] The following are Tandrill's 1979 positions established or offset, and contrary positions:

| Date | Position Established or Offset | Contrary Position |
|------|-------------------------------|-------------------|
| 11/1/79 | Sold short 18 Apr. '81 gold | Bought 18 Feb. '81 gold |
| 11/6/79 | Sold short 146 Apr. '81 gold | Bought 146 Feb.'81 gold |
| 11/21/79 | Repurchased 164 Apr. '81 | Sold short 117 Dec.'80 gold |
| | | Sold short 27 June '81 gold |
| 11/15/79 | Sold short 119 May '80 silver | Bought 119 July '80 silver |
| 11/21/79 | Repurchased 119 May '80 silver | Sold Short 75 Mar. '80 silver |
| | | Sold short 44 Sept. '80 silver |
| 11/1/79 | Sold short 73 Dec. '80 silver | Bought 73 Jan. '81 silver |
| 11/2/79 | Sold short 79 Dec. '80 silver | Bought 79 Jan. '81 silver |
| 11/5/79 | Sold short 88 Dec. '80 silver | Bought 88 Jan. '81 silver |
| 11/21/79 | Repurchased 240 Dec. '80 silver | Sold short 108 Mar. '81 silver |
| | | Sold short 132 Sept. '80 silver |
| 11/15/79 | Sold short 108 Mar. '81 silver | Bought 108 Dec. '80 silver |
| 11/27/79 | Repurchased 108 Mar. '81 silver | Sold short 108 Dec. '80 silver |
| 11/21/79 | Sold short 75 Mar. '80 silver | Bought 75 May '80 silver |
| 11/27/79 | Repurchased 75 Mar. '80 silver | Sold short 75 May '80 silver |
| 11/21/79 | Sold short 132 Sept. '80 silver | Bought 132 Dec. '80 silver |
| 11/21/79 | Sold short 44 Sept. '80 silver | Bought 44 May '80 silver |
| 11/27/79 | Repurchased 176 Sept. '80 silver | Sold short 132 Dec. '80 silver |
| | | Sold short 44 May '80 silver |
| 11/27/79 | Sold short 3 Dec. '80 silver | Bought 3 Sept. '80 silver |
| 12/26/79 | Repurchased 3 Dec. '80 silver | Sold short 3 Mar. '81 silver |
| 11/14/79 | Sold short 20 Mar. '80 copper | Bought 20 May '80 copper |
| 11/21/79 | Repurchased 10 Mar. '80 copper | Sold short 10 July '80 copper |
| 11/23/79 | Repurchased 10 Mar. '80 copper | Sold short 10 July '80 copper |
| 11/21/79 | Sold short 10 July '80 copper | Sold 10 Mar. '80 copper |
| 11/23/79 | Sold short 10 July '80 copper | Sold 10 Mar. '80 copper |
| 11/26/79 | Sold short 40 July '80 copper | Bought 20 May '80 copper |
| | | Bought 20 Sept. '80 copper |
| 12/3/79 | Repurchased 20 July '80 copper | Sold short 20 Dec. '80 copper |
| 12/13/79 | Repurchased 20 July '80 copper | Sold short 20 Mar. '80 copper |
| 12/19/79 | Repurchased 20 July '80 copper | Sold short 20 Mar. '80 copper |
| 11/26/79 | Bought 20 Sept. '80 copper | Sold short 20 July '80 copper |
| 12/7/79 | Sold 20 Sept. '80 copper | Bought 20 May '80 copper |

involved futures contracts in copper, gold, 90-day Treasury bills, sugar, GNMA's, and 30-year U.S. Treasury bonds.[27]

Mr. Maduff focused on the GNMA's and bond trades. He opined that the GNMA and bond[28] trades appear to have been intended to roll gains from 1980 into 1981, and in fact succeeded in rolling $695,156.25 of gains into 1981. In addition, because these trades involved contracts not maturing until 1982, they had the potential of generating long-term gains and short-term losses. After examining these transactions, Mr. Maduff concluded that these trades did not have any profit motive or potential.

The GNMA and Treasury bond transactions were established on June 26 and 27, 1980, with the purchase on each day of: 15 March

[27] With the exception of the GNMA's and bonds, all of the transactions were initiated by July 1, 1980, and closed out by Dec. 31, 1980. Thus, Mr. Maduff did not perform a detailed study of the copper, gold, 90-day Treasury bill, or sugar transactions because it was clear that they were not used to postpone income recognition from one year to the next. Also, they did not have the potential for long-term capital gains because all were closed out in less than 6 months.

[28] Treasury bond futures contracts and GNMA futures contracts are similar instruments. Both consist of 30-year debt instruments with a $100,000 face value and a nominal 8-percent "coupon". Bonds are obligations of the U.S. Government; GNMA's are mortgage-backed debt instruments guaranteed by an agency of the U.S. Government. The primary difference is that, in periods of falling interest rates, GNMA's are subject to prepayment while bonds are not.

In addition, these debt instruments, which on their face provide a constant income flow for approximately 30 years, will fluctuate in value with interest rates. However, a 3-month spread in either bonds or GNMA's will tend to be stable because that spread represents only the difference between 90-day interest rates and 30-year interest rates for a 90-day period rather than 30-year interest rates themselves.

1981 GNMA contracts and the simultaneous sale of 15 September 1981 GNMA contracts; and the purchase on each day of 15 September 1981 Treasury bond contracts and the simultaneous sale of 15 March 1981 Treasury bond contracts. These transactions taken as a whole have the appearance, and effect, of incurring minimum market exposure to risk of loss and no possibility of net gain (after transaction costs) notwithstanding the fact that the transactions, viewed separately, each had the possibility of making or losing thousands of dollars per contract. This was accomplished by establishing "straddles of straddles".[29]

While Tandrill's GNMA trades consisted of long March and short September (a 6-month forward spread), the bond trades were the opposite, short March and long September (a 6-month back spread). Consequently, while either the GNMA straddle or bond straddle taken

---

[29] For example, Tandrill's bond trades of June 26 and 27, 1980, occurred as follows: In that period the price of March GNMA's dropped $1,062.50 per contract and the price of March bonds dropped $1,250 per contract. At the same time the March/September GNMA spread moved $93.75 per contract, and the March/September bond spread moved $62.50 per contract. Finally, the entire position taken as a whole moved the minimum possible increment that day, $31.25 per contract.

On Oct. 28, 1980, Tandrill executed a straddle of a straddle involving GNMA's and bonds, buying 30 June GNMA's and simultaneously selling 30 March GNMA's, and buying 30 June bonds and simultaneously selling 30 September bonds. These transactions resulted in recognition of a $327,030 loss on the GNMA's and a $368,280 loss on the bonds and still left Tandrill with offsetting 3-month straddles, June/September GNMA's vs. June/March bonds. On Oct. 30, 1980, after recognizing a net loss of $693,750 (plus commissions of $1,560), Tandrill still had profits of $691,406.25 in its open GNMA/bond position, for a net loss of $2,343.75 (or 2-1/2 points per contract). This loss is primarily attributable to transaction costs.

in isolation would allow the investor to profit or lose based on the relative fluctuation of long and short-term interest rates, the two positions taken together would result in virtually no fluctuation at all.

Mr. Maduff's Conclusions

1. Taken in isolation, Tandrill's 1979 Treasury bill trading established through Bache appears to have been taken with a profit motive.[30]

2. Tandrill's 1979 gold, silver, and copper straddle transactions established through Bache were "tax straddles", entered into without an objective of earning an economic profit.

3. Tandrill's 1980 GNMA and Treasury bond transactions established through ACLI were "tax straddles", entered into without an objective of earning an economic profit.

Mr. Borst

Petitioners' expert, Thomas J. Borst, received a B.S. in business administration from Miami University (in Oxford, Ohio) in 1962, and an M.B.A. from the Wharton School of Commerce and Finance at the University of Pennsylvania in 1964. After working for Inland Steel Company and International Business Machines Corp., Mr. Borst became an institutional and retail securities broker with several securities firms between 1968 and 1974. Later, he began trading on the Chicago Board Options Exchange as an independent market maker

---

[30] Mr. Maduff asserted that he cannot "be certain" of this conclusion because of "inadequate documentation".

and then on the Chicago Board of Trade as an independent floor trader. He also was a principal of Frontier Limited, a commodity trading advisory firm, and a vice president of Hedged Portfolio Advisors, Inc., a firm that provided sophisticated tactical trading data and advice to institutions. Since 1991, he has traded solely on the Chicago Board of Trade.

Mr. Borst's report and testimony dealt with Tandrill's Treasury bill futures contracts and Treasury bill options contracts during the last 4 months of 1979.[31] His primary conclusion was that Tandrill's transactions "had the potential to earn a profit".

Treasury Bill Futures Contracts

For the period beginning September 29, 1979, Tandrill shorted 90-day Treasury bill futures contracts. This initial strategy reflected Tandrill's expectation that interest rates would increase.[32]

Treasury Bill Options Contracts

For the period beginning September 29, 1979, Tandrill's Treasury bill options trading consisted of "selling" vertical put

---

[31] In addition to his expert report, Mr. Borst prepared a rebuttal report which briefly discussed gold and silver commodity futures, commodity trading, and the Black-Scholes Model.

[32] Short Treasury bill futures positions increase in value as the price of Treasury bills decrease in value (when interest rates increase). Conversely, short Treasury bill futures positions decrease in value as the price of Treasury bills increases (when interest rates decrease).

spreads and thereafter closing these positions by "buying" vertical put spreads.[33]

Credit Option Spreads

Part of Tandrill's trading strategy was to purchase Treasury bill put options at one strike price and sell the same amount of Treasury bill put options at a higher strike price for the same maturity month.[34]

Mr. Borst provided an example of the type of credit spreads in which Tandrill engaged. On September 20, 1979, 6 December 1979 Treasury bill futures contracts were "sold" by the trader at 90.25 and 90.26, and 11 March 1980 Treasury Bill futures contracts were "sold" by the trader at 90.89. Also, a total of 47 March 97.50 puts were "bought" for a total price of $1,153,991, and 47 March 97.625 puts were "sold" for $1,178,995. The credit on the options positions was $25,004.

---

[33] Each option was on $1 million face value Treasury bills; the minimum price movement was $.01 ($100). The underlying Treasury bills' maturity date depended upon the expiration date of the option. The usual maturity date of the Treasury bills was about 3 months after the expiration date of the option.

[34] The year 1979 was an extremely volatile period for interest rates in the United States. Rates were increasing rapidly into September 1979 and during that month. Tandrill's strategy in this regard provided some risk control in the event that Treasury bill interest rates that had been increasing began to decline. If interest rates fell, the price of the short Treasury bill futures positions would increase, thereby creating losses for Tandrill.

Because Tandrill's options trades in the aggregate generated a credit, its put positions could suffer an unfavorable price movement and still provide Tandrill with an overall profit. Further, Tandrill's put positions provide it with the ability to absorb some of the risk in its futures positions. That is, the put positions could, in the aggregate, move unfavorably by $25,004 before Tandrill suffered a net loss. Thus, $25,004 could be used as a cushion to absorb losses in the short futures positions (if the price of the short futures positions increased rather than decreased).

Tandrill's Portfolio Trading Strategy

Tandrill's initial trading strategy was to build a portfolio of Treasury bill put option credit spreads and short futures positions in Treasury bills. During this period, Tandrill closed some of its short commodity futures positions at a profit. For example, on October 3, 1979, it closed two of its short futures contracts (December) at 88.80 and two more on October 8 at 89.90--a profit before commissions of $9,000. Mr. Borst stated that interest rates were rising at the time Tandrill closed out its short position, as evidenced by the fact that the closing price of the short futures contracts in October was lower than the price of the contracts when they were entered into in September. But Tandrill did not simultaneously close its put positions obtained on September 20. Mr. Borst believed that this was understandable

because it was probable that the credit spread put positions would have suffered losses in the aggregate.[35]

## Tandrill's Positions at September 30, 1979

At the end of September, Tandrill was short 56 Treasury bill futures, a position worth millions of dollars. Tandrill had partially reduced the risk of this position by selling 144 put spreads, each on $1 million worth of Treasury bill futures. Although Tandrill received $78,000 in premiums from selling the higher strike puts over the lower, it stood to lose $180,000 if both ends of the spreads expired in the money, and thus could have incurred an overall net loss of $102,000.

Despite this potential loss, Tandrill covered the short futures in early October, while actually increasing the short put exposure. Tandrill realized an $82,500 profit from covering its short Decembers.

The trade also locked in an additional $100,000 to $125,000 profit on the new March-December Treasury bill futures spread. Mr. Borst believed that Tandrill made a very bold and risky move, switching from a very bearish position to a very bullish one.

## Tandrill's Positions at October 31, 1979

Tandrill was long December 1979 Treasury bill futures against an equal number of the March 1980 Treasury bill futures. The long

---

[35] Mr. Natenberg disagreed with this analysis. He opined that if one enters a position as a true hedge, once the primary asset has been disposed of, the hedge is no longer required. According to Mr. Natenberg, a true hedger would liquidate the hedge at the time of disposition of the primary asset.

position was rapidly moving toward the price of the 1-year bills whereas the March future had a substantially longer time to expiration, so Tandrill had an opportunity to profit further on this spread if short rates stabilized or fell. According to Mr. Borst, Tandrill was also well positioned with its options spreads.

Tandrill's Trading October 31-November 15, 1979

As of November 15, 1979, Tandrill had completed the unwinding of its credit spreads. As short-term interest rates continued to rise, the results were worse than anticipated. Tandrill, however, had approximately 150 basis points locked into its futures spread. Thus, Tandrill "took off" some of these points by covering a part of its short position and realized a $13,000 profit.

Tandrill's Final Trades: November 19-December 7, 1979

Tandrill closed out its last options spread over a 5-day period in late November. It did not adjust its futures position until about a week later, effectively switching its position from bearish to bullish, as it held one extra December Treasury bill future. On November 28, 1979, it sold 26 December Treasury bill futures and bought only 21 March, shifting again to an aggressively bearish stance, as it was now short ($1 million worth) of Treasury bill futures and held that position until December 7, 1979.

Tandrill was unable to buy the rest of its Treasury bill futures spreads at 50 basis points, but rather, it had to pay 90 basis points for 21 spreads on November 28. Through its

speculative "legs", however, Mr. Borst believed that Tandrill "made the best of a deteriorating situation". The last three spreads Tandrill bought on December 7 resulted in its reducing its profit further, but it was short two extra March Treasury bill futures, which it also covered at this point at the lowest price of any March transaction.

Conclusion

Mr. Borst opined that the aforementioned trading transactions were "very sophisticated". Tandrill's trader managed huge positions very "adroitly" in extremely volatile financial instruments and a volatile financial market. Mr. Borst concluded that because Tandrill earned approximately $78,000 during a 2-1/2 month period, such fact demonstrated the high quality of Tandrill's trading ability, as well as the fact that Tandrill's strategies had the economic potential to earn a profit.

Mr. Natenberg's Rebuttal of Mr. Borst's Report

Mr. Natenberg disagreed with Mr. Borst's conclusions. According to Mr. Natenberg, while a trader may hedge, the fact that he does so is not necessarily a sign of experience. A new trader may choose a poor hedge, either one where the trader misjudges the amount of protection offered by the hedge, or one where the cost of the hedge is too great relative to the protection. Nor does the fact that a hedge is constructed necessarily show that it was done with the intention of earning a profit, either in the hedge or in

the primary asset.  In fact, Mr. Natenburg believes Tandrill paid more for some of the option hedges than they could ever be worth.

The Relevant Law

Section 165(c)(2) provides that, in the case of an individual, the deduction for losses set forth in section 165(a) is limited to "losses incurred in any transaction entered into for profit, though not connected with a trade or business".  Accordingly, in order for Tandrill's losses to be deductible, petitioners must establish that the transactions giving rise to them were "entered into for profit".  Fox v. Commissioner, 82 T.C. 1001, 1018 (1984); Smith v. Commissioner, 78 T.C. 350, 390 (1982).  For this purpose, "profit" means economic profit, independent of tax savings.  Surloff v. Commissioner, 81 T.C. 210, 233 (1983).

Section 108 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514,  100 Stat. 2817, provides as follows:

SEC. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981.

(a) General Rule.--For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions--

(1) which were entered into before 1982 and form part of a straddle, and

(2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business.

(b) Loss Incurred in a Trade or Business.--For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.

Accordingly, a taxpayer, other than a commodities dealer,[36] is not eligible to deduct a loss on the disposition of a leg in a straddle, unless the taxpayer proves that the loss was incurred "in a transaction entered into for profit". DEFRA sec. 108 as amended. To meet this requirement the taxpayer must establish that he entered into the straddle transaction primarily for profit. Ewing v. Commissioner, 91 T.C. 396, 416-417 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Boswell v. Commissioner, 91 T.C. 151, 158-159 (1988). To meet the primarily-for-profit test, the investor need not be unaware of the tax consequences that might ensue from his transactions. However, where an investor has a profit motive as well as a tax motive for entering into the investment, the profit motive must be of first importance.

Because petitioner's investments were made through Tandrill, the existence of a profit motive must be determined at the

---

[36] Neither respondent nor petitioners contend that petitioner or Tandrill was a commodities dealer for purposes of the profit motive presumption of DEFRA sec. 108(b) as amended. See Kovner v. Commissioner, 94 T.C. 893 (1990).

partnership level.  Rosenfeld v. Commissioner, 82 T.C. 105, 112 (1984); Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Hager v. Commissioner, 76 T.C. 759, 784 (1981).  A partnership's profit motivation is determined by reference to the actions of the general partners who manage the affairs of the partnership.  See Resnik v. Commissioner, 66 T.C. 74 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977).

In Ewing v. Commissioner, supra at 417-418, it was established that profit must be the taxpayer's primary motive in order for a loss from a particular straddle transaction to be deductible.  In Ewing we also set forth the following additional guidelines, taken from Fox v. Commissioner, 82 T.C. 1001 (1984):

(1)  The ultimate issue is profit motive and not profit potential.  However, profit potential is a relevant factor to be considered in determining profit motive.  82 T.C. at 1021.

(2)  Profit motive refers to economic profit independent of tax savings.  82 T.C. at 1022.

(3)  The determination of profit motive must be made with reference to the spread positions of the straddle and not merely to the losing legs, since it is the overall scheme which determines the deductibility or nondeductibility of the loss.  82 T.C. at 1018, citing Smith v. Commissioner, 78 T.C. at 390-391.

(4)  If there are two or more motives, it must be determined which is primary, or of first importance.  The determination is essentially factual, and greater weight is to be given to objective facts than to self-serving statements characterizing intent.  82 T.C. at 1022.

(5) Because the statute speaks of motive in "entering" a transaction, the main focus must be at the

time the transactions were initiated. However, all circumstances surrounding the transactions are material to the question of intent. 82 T.C. at 1022. [Ewing v. Commissioner, supra at 417-418]

Petitioners contend that Tandrill's primary purpose in entering into the transactions at issue was to further its profit-making objectives. Respondent, on the other hand, argues that Tandrill did not enter into these transactions primarily for profit. Respondent further contends that the most important factor determining profit is the trading pattern involved. Each party relies on its expert's analysis of Tandrill's trading.

Tandrill's Trading Activities Were Not Profit Motivated

We have considered the qualifications and experience of the parties' experts and their particular knowledge and experience in options and futures transactions, as well as the substance and reasoning of their reports. We found respondent's expert witness reports and testimony more useful and persuasive than that of petitioner's. Messrs. Natenberg's and Maduff's reports support our conclusion that tax considerations primarily motivated Tandrill's trading.[37]

---

[37] Mr. Maduff concluded that Tandrill's 1979 Treasury bill trading established through Bache appears to have been taken with a profit motive. We therefore assume that respondent concedes that these trades were taken with a profit motive. Thus, the following discussion does not address Tandrill's 1979 Treasury bill trading established through Bache.

### a. Tandrill Paid More than Fair Value When Purchasing Option Spreads and Received Less than Fair Value When Selling Option Spreads

Tandrill's put option spreads resulted in losses solely because: (1) With regard to the credit spreads, Tandrill received less than fair value when it initiated the spreads and paid more than fair value when it closed out such spreads; and (2) with regard to the debit spreads, Tandrill received less than fair value when it closed out the spreads.

The option spreads (unlike the futures transactions) were not executed on a regulated exchange. They were over-the-counter transactions executed through Pershing and Arbitrage Management. Thus, there was no active trading market to assure a fair price to all traders. Further, there was no institutional safeguard to prevent Pershing or Arbitrage Management from charging Tandrill more (or paying Tandrill less) than some other trader for an identical position.

There is no evidence in the record that Tandrill bargained with Pershing or Arbitrage Management, or engaged in "comparison shopping", to insure that it received fair prices, even though there were three or four dealers that made a market in over-the-counter Treasury bill options. Mr. Illingworth did not instruct Messrs. Willensky and Sherman of Wilcap (who placed the actual trades) to attempt to get the best price they could for the option spreads, nor

did he otherwise discuss with them the prices they were getting for the spreads.

Moreover, even though in 1979 options traders generally relied upon the Black-Scholes theoretical pricing model, Mr. Illingworth was unaware of the model. Even in the absence of Mr. Illingworth's usage of the Black-Scholes theoretical pricing model, Mr. Illingworth should have known that Tandrill was systematically receiving far less than fair value for the spreads it was selling.[38] Such transactions result from a systematic disregard of economic values in executing option spread transactions.[39]

---

[38]  For example, when Tandrill closed out its credit spreads, in each case it paid more for the closing spread than its maximum theoretical value.

[39]  Respondent claims that Fox v. Commissioner, 82 T.C. 1001 (1984), is factually similar to this case. Respondent posits that Tandrill's option spreads were similar to the 1977 series of transactions in Fox in that both were initiated and closed out in the same year and over a relatively short period of time.
    In Fox all the transactions were executed through Arbitrage Management. Like Tandrill's two option spread transactions executed through Arbitrage Management (but unlike the six such transactions executed through Pershing), the spreads in Fox were debit and bearish spreads. Id. at 1003. Also, the taxpayers in Fox and Tandrill each sustained economic losses. Id. at 1004.
    Further, the tax strategy used by the taxpayer in Fox was very similar to the strategy Tandrill followed. The taxpayer in Fox reported ordinary losses and short-term capital gains for the years in issue, treating the dispositions of individual legs of the spreads as separate taxable events. Because Treasury bills were at that time specifically excluded from the definition of a capital asset by sec. 1221(5), the taxpayer reported the losses as ordinary losses. This Court upheld the deficiency, holding that the taxpayer did not enter into the transactions

(continued...)

b.  Tandrill's Futures Transactions Were Not Profit Motivated

Tandrill's 1979 gold, silver, and copper futures transactions and the 1980 Treasury bond and GNMA futures transactions were entered into for the purpose of deferring income from one tax year to the next, and generating approximately equal amounts of short-term capital loss and long-term capital gain.  The futures straddles were designed to minimize the volatility of the straddle as a whole, yet produce substantial losses in one leg of the straddle (and offsetting gain in the other leg).  The loss was then realized, and the gain deferred.  In Tandrill's straddles, the opportunity for profit and risk of loss was minimized by keeping the spreads in effect for short periods of time, putting on spreads with short intervals between delivery dates, and maximizing the butterfly effect.[40]

---

[39](...continued)
primarily for profit and that the transactions were not a type of tax-motivated transaction that Congress intended to encourage.

Petitioners attempt to distinguish Fox on the grounds that the taxpayer in Fox: (1) Did not engage in any Treasury bill futures trading; (2) conducted all the trading in "isolated year-end transactions" that were "unquestionably tax motivated"; and (3) had entered into the options transactions only after both he and his accountant had "thoroughly investigated their potential tax benefits."

We agree with respondent that the two options spreads Tandrill initiated through Arbitrage Management were similar to the spreads in Fox.

[40]   More specifically, Tandrill's commodity futures trading was used to defer income from 1979 into 1980 in the case of the gold, silver, and copper straddles cleared through Bache, and from 1980 into 1981 in the case of the Treasury bond and GNMA

(continued...)

This strategy reduced Tandrill's overall potential for economic profit or loss, but substantially increased its transactional costs. We are convinced that Tandrill's primary aim was to generate tax benefits.

The tax-motivated nature of Tandrill's futures straddles is reflected in the timing of the transactions that closed out its losses. For example, in 1979 the loss legs of the precious metals straddles were closed out on dates of large price movements in the underlying metals.[41] The record indicates that in November 1979, traders closed out their short silver positions and simultaneously replaced them with other short silver positions. The sole motivation of this strategy was to lock in a tax loss for 1979 and to push the corresponding gain into 1980. This is precisely what Tandrill did. Of the 721 silver contracts that it closed out in 1979, 718 were closed out either on November 21, 1979, or November 27, 1979, landmark dates for large price movements.

---

[40](...continued)
futures straddles cleared through ACLI.

[41]     For instance, in November 1979, the price of silver futures fluctuated far more than normal. This meant that for traders holding silver spreads, both long and short legs increased sharply in value, placing the long leg in a position with a substantial profit and the short leg in a position with a substantial loss. For tax-motivated individuals, this was the optimal occasion to close out the loss leg, realizing the loss for tax purposes, and to replace that position with another short position comprising the same number of silver contracts (typically with a delivery date late in 1980).

c.  Tandrill's Overall Tax Strategy

The purpose of Tandrill's investment strategy was to generate losses from the loss legs of its Treasury bill option spreads that would be deductible by petitioners as ordinary losses in 1979 and to generate a corresponding (though somewhat smaller) amount of gain from the profit legs of the option spreads that would be taxable as short-term capital gains.  From its futures straddles, Tandrill's purpose was to generate short-term capital losses in 1979 that would offset the short-term capital gains generated by the Treasury bill options transactions, and to defer the recognition of gain from the profit legs of such commodity futures straddles until a subsequent year.  The gain was carried forward into 1980 and realized as long-term capital gain.  A similar approach was used to defer capital-gain income from 1980 into 1981.  Such strategy was employed to produce in substance an economic loss on a long-term basis.

We agree with respondent that Tandrill's options transactions employed a character-mismatching strategy similar to the 1977 options spreads in Fox v. Commissioner, 82 T.C. 1001 (1984).  The loss on the loss leg of each option spread would be an ordinary loss; the profit on the gain leg would be a short-term capital gain.

The ordinary losses Tandrill reported on its Form 1065 for 1979 arose from Treasury bill options transactions (and, to a minor extent, from deductions for management and accounting fees).  The losses from Treasury bill transactions for 1979 amounted to $1,858,743 and arose from purchased put options that were closed out

at a loss in 1979. Because the losses were on purchased puts, they purportedly qualified for ordinary loss treatment under section 1234.[42]

The $163,666 in net short-term capital gain Tandrill reported for 1979 represents the excess of its short-term capital gains of $1,736,366 over its short-term capital losses of $1,572,700. Tandrill realized its short-term capital gains on put options on Treasury bills and the short-term capital losses from the loss legs of futures straddles on gold, silver, copper, and Treasury bills.[43] Tandrill's $1,509,077 of long-term capital gain for 1980 resulted from the closing out of Tandrill's commodity futures straddles.

We are convinced that Tandrill's overall trading strategy was geared toward the assurance of tax savings for its partners rather than a real profit motive. See, e.g., Leslie v. Commissioner, T.C. Memo. 1996-86 (dealing with profit motive in gold futures transactions). And profit motive is the crucial test. See, e.g., Fox v. Commissioner, supra at 1021.

---

[42] Sec. 1234(a)(1) provides that the character of the gain or loss on the sale or exchange of a purchased option is the same as the character of the gain or loss on the sale of the property to which the option relates. Because Treasury bills were at that time specifically excluded from the definition of a capital asset by sec. 1221(5), Tandrill reported the losses as ordinary losses.

[43] Under sec. 1234(b), the character of the gain or loss recognized on the closing out of granted options is short-term capital gain or loss.

Petitioner and Mr. Illingworth

Both petitioner and Mr. Illingworth testified that they did not discuss the tax ramifications of creating and operating Tandrill. Under the circumstances herein, we are not required to, and we do not, accept the self-serving testimonial evidence presented by petitioners to sustain their burden of establishing error in respondent's determination.[44] See Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159.

Based upon the entire record, we conclude that petitioner became a partner in Tandrill in order to reap tax benefits; i.e., to offset the $3,492,989 gain he realized in 1976 from the sale of his Hy-Gain stock with losses from Tandrill. The record makes it clear that petitioner, Mr. Illingworth, and Tandrill all had the same primary objective: to create tax losses. The absence of a primary for-profit objective is "so obvious that it must be the same for all of the individual partners or their [partnership]." Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992). Thus, it makes no practical difference whether the relevant motive belongs to petitioner, Mr. Illingworth, or Tandrill itself.

Petitioner willingly accepted the Partnership and Management Agreements. He contributed $300,000 for a 93.75-percent interest; Mr. Illingworth contributed $20,000 for a 6.25-percent interest.

---

[44] Petitioner's testimony was marked by frequent failures of recall, and he failed to provide answers to simple questions.

However, Tandrill paid Mr. Illingworth's company, Manhattan Metals, $10,000 (denominated as a retainer and organization fee) upon the signing of the Management Agreement. Thus, in essence, Mr. Illingworth's net contribution was approximately $10,000.

In addition, in 1980 Manhattan Metals received a $50,000 management fee (and $25,000 annually thereafter), plus an incentive payment that would be triggered if the net assets of Tandrill increased beyond a stipulated annual percentage threshold. Manhattan Metals also had the right to share in the brokerage commissions and other fees Tandrill paid.

Petitioner's $300,000 investment was a fraction of the tax benefits that Tandrill's transactions were expected to provide. Petitioners' total deficiencies of $986,305 for 1976 and 1980 (arising from the disallowance of Tandrill's losses) represent a claimed tax benefit of more than three times his investment in Tandrill. We believe that petitioner agreed to the arrangement with Mr. Illingworth and Manhattan Metals because tax savings, rather than Tandrill's economic performance, was petitioner's primary objective.

Petitioner was a prototypical "passive investor". He did not have a meaningful role in Tandrill's management. Tandrill only engaged in trading activities, and these activities were delegated to Manhattan Metals (and hence effectively to Mr. Illingworth) by means of the Management Agreement. Petitioner testified that he did not understand Tandrill's trading activities. Although he claims to

have invested in Tandrill in order to earn a profit, we believe that petitioner chose to invest in an area in which he had little background in order to realize tax benefits.

Petitioner was financially sophisticated. His tax advisers at Peak Marwick gave him "an education" on the anticipated tax benefits of Tandrill's trading. They informed him that the tax consequences of his investment in Tandrill "could be advantageous." It is clear that petitioner expected the tax losses that Tandrill generated.

Moreover, petitioner expected to carry back losses from Tandrill 3 years. See sec. 172(b)(1)(A). Tandrill began operations in 1979, and that year petitioner carried his Tandrill losses back to 1976, the year in which he reported a gain of almost $3.5 million from the sale of Hy-Gain stock and an adjusted gross income of $2,047,797. Petitioners' tax liability for 1976 was $1,355,566.

Thus, as a result of investing in Tandrill, petitioners were expecting to carry back a net operating loss into 1976. This carryback would reduce their tax liability by $1,053,742. This reduction, more than any supposed profit potential, was petitioner's real motive.

Mr. Illingworth was the "brains" behind Tandrill's trading activities. While he clearly understood the nature of Tandrill's options and futures transactions, he delegated at least a considerable portion of the decision making.[45] Concurrently, Mr.

---

[45] Mr. Illingworth's precise role in Tandrill's trading
(continued...)

Illingworth was involved with other partnerships that realized tax losses in all years for which their results are in evidence. The partnerships had similar trading patterns to Tandrill. This is another indication that Mr. Illingworth's "expertise" as a trader lay in his ability to produce tax losses for his partners.

Conclusion

We conclude that Tandrill did not enter into the options and futures transactions with a primary profit motive. Thus, respondent properly disallowed petitioners' allocable share of Tandrill's 1979 and 1980 losses under section 165(c)(2).

Issue 2. Section 6653(a) Additions to Tax

The second issue is whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations for 1976 and 1980. For these years, respondent has the burden of proving petitioners' negligence or disregard of rules and regulations because it is a new matter raised in respondent's amended answer. Rule 142(a).

---

[45](...continued)
activities is unclear. As president of Manhattan Metals, he had ultimate responsibility for Tandrill's trading. However, the extent to which Mr. Illingworth personally determined which trades Tandrill should make, what trading strategies Tandrill should adopt, or the degree of his oversight is uncertain. For example, he apparently delegated all responsibility for the options trading to Messrs. Willensky and Sherman of Wilcap Advisors, and for the futures trading to Mr. Weiss, a Manhattan Metals employee. And Mr. Illingworth testified that Mr. Weiss did not discuss his trades with Mr. Illingworth.

Section 6653(a) for 1976 and 1980 imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Based upon the record before us, we conclude that respondent has not satisfied her burden of proof on this issue. Thus, petitioners are not liable for the section 6653(a) additions to tax for 1976 and 1980.

Issue 3. Section 6621(c) Additional Interest

The third issue is whether petitioners are liable for additional interest for 1976 and 1980. Respondent determined that petitioners are liable for the increased rate of interest provided in section 6621(c) (formerly section 6621(d)). Respondent has the burden of proof on this issue with regard to 1976 (because it is a new matter raised in respondent's amended answer) and petitioners have the burden of proof with regard to 1980.

Section 6621(c) provides for an interest rate on substantial underpayments attributable to tax-motivated transactions that is 120 percent of the underpayment rate provided in section 6601. See Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 413-415 (1986). Section 6621(c) applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner, 85 T.C.

552, 555-557 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). An underpayment is substantial if it exceeds $1,000. Sec. 6621(c)(2). The phrase "tax-motivated transactions" includes straddles and transactions lacking a profit motive. See Ewing v. Commissioner, 91 T.C. at 422-423.

We have concluded that petitioner and Mr. Illingworth formed Tandrill for the purpose of generating tax benefits. Moreover, the $1,000 statutory threshold is surpassed in this case for both taxable years in issue. Consequently, petitioners' underpayments based on the losses attributable to tax-motivated transactions are subject to the additional interest provided by section 6621(c). We hold that petitioners are liable for the increased rate of interest under section 6621(c) on the entire underpayments for 1976 and 1980.

To reflect the foregoing,

Decision will be

entered under Rule 155.

APPENDIX A

TANDRILL'S 1979 PURCHASES OF PUT OPTION POSITIONS THROUGH

PERSHING AND BY THE CORRESPONDING SALES OF SUCH POSITIONS

In all of the transactions below, the expiration date for the option was December 5, 1979, and the expiration date of the underlying Treasury bill was March 4, 1980.

| Purchases | | | | Sales | | |
|-----------|------|--------|-----------|-------|-----|-----------|
| Date | No. | Yield | Cost | Date | No. | Proceeds |
| 9/20 | 47 | 97.50 | $1,153,991 | 11/7 | 33 | $ 544,731 |
| | | | | 11/8 | 14 | 225,498 |
| 11/7 | 33 | 97.625 | 586,905 | | | |
| 11/8 | 14 | 97.625 | 243,404 | 9/20 | 47 | 1,178,995 |
| 9/24 | 41 | 97.53 | 941,196 | 11/12 | 20 | 280,600 |
| | | | | 11/13 | 6 | 82,044 |
| | | | | 11/14 | 7 | 92,785 |
| | | | | 11/15 | 8 | 99,640 |
| 11/12 | 20 | 97.65 | 305,220 | | | |
| 11/13 | 6 | 97.65 | 89,436 | | | |
| 11/14 | 7 | 97.65 | 101,402 | | | |
| 11/15 | 8 | 97.65 | 109,496 | 9/24 | 41 | 962,721 |
| 9/25 | 40 | 97.53 | 902,320 | 11/9 | 40 | 610,640 |
| 11/9 | 40 | 97.65 | 659,840 | 9/25 | 40 | 924,280 |
| 9/26 | 16 | 97.50 | 354,128 | 11/9 | 8 | 119,752 |
| | | | | 11/12 | 4 | 54,928 |
| | | | | 11/13 | 4 | 53,508 |
| 11/9 | 8 | 97.625 | 129,984 | | | |
| 11/12 | 4 | 97.625 | 60,052 | | | |
| 11/13 | 4 | 97.625 | 58,628 | 9/26 | 16 | 363,968 |
| 10/2 | 26 | 97.45 | 516,282 | 11/9 | 11 | 159,203 |
| | | | | 11/12 | 10 | 132,360 |
| | | | | 11/15 | 5 | 58,300 |
| 11/9 | 11 | 97.51 | 166,188 | | | |
| 11/12 | 10 | 97.51 | 138,720 | | | |
| 11/15 | 5 | 97.51 | 61,480 | 10/2 | 26 | 523,120 |
| 10/3 | 8 | 97.45 | 158,344 | 11/14 | 8 | 99,680 |
| 11/14 | 8 | 97.51 | 104,768 | 10/3 | 8 | 160,520 |

APPENDIX B

TANDRILL'S 1979 PURCHASES OF PUT OPTION POSITIONS THROUGH

ARBITRAGE MANAGEMENT AND THE CORRESPONDING SALES OF SUCH

POSITIONS

In all of the transactions below, the expiration date for the option was March 26, 1980, and the expiration date of the underlying Treasury bill was June 24, 1980.

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| Date | No. | Yield | Cost | Date | No. | Proceeds |
| 10/30 | 25 | 97.16 | $1,464,975 | 11/20 | 13 | $632,476 |
|  |  |  |  | 11/21 | 10 | 488,170 |
|  |  |  |  | 11/23 | 2 | 96,562 |
| 11/20 | 13 | 97.08 | 629,408 |  |  |  |
| 11/21 | 10 | 97.08 | 485,470 |  |  |  |
| 11/23 | 2 | 97.08 | 96,162 | 10/30 | 25 | 1,454,325 |
| 10/31 | 24 | 97.16 | 1,389,744 | 11/19 | 24 | 1,191,360 |
| 11/19 | 24 | 97.08 | 1,185,192 | 10/31 | 24 | 1,380,192 |

APPENDIX C

TANDRILL'S 1979 PUT OPTION SPREAD TRANSACTIONS THROUGH PERSHING

AND ARBITRAGE MANAGEMENT

In all of the transactions below, the expiration date for the option was December 5, 1979, and the issuance date of the underlying Treasury bill was March 4, 1980.

| Trade Date | Type | No. | Trade | Commission | Cash Flow |
|---|---|---|---|---|---|
| Opening Trade: | | | | | |
| 9/20 | Bought | 47 | 97.50 | $940 | $(1,153,991) |
| | Sold | 47 | 97.625 | 940 | 1,178,995 |
| | | | | | 25,004 |
| Closing Trades: | | | | | |
| 11/7 | Sold | 33 | 97.50 | 660 | 544,731 |
| | Bought | 33 | 97.625 | 660 | (586,905) |
| | | | | | (42,174) |
| 11/8 | Sold | 14 | 97.50 | 280 | 225,498 |
| | Bought | 14 | 97.625 | 280 | (243,404) |
| | | | | | (17,906) |
| Opening Trade: | | | | | |
| 9/24 | Bought | 41 | 97.53 | 820 | (941,196) |
| | Sold | 41 | 97.65 | 820 | 962,721 |
| | | | | | 21,525 |
| Closing Trades: | | | | | |
| 11/12 | Sold | 20 | 97.53 | 400 | 280,600 |
| | Bought | 20 | 97.65 | 400 | (305,220) |
| | | | | | ( 24,620) |
| 11/13 | Sold | 6 | 97.53 | 120 | 82,044 |
| | Bought | 6 | 97.65 | 120 | (89,436) |
| | | | | | ( 7,392) |
| 11/14 | Sold | 7 | 97.53 | 140 | 92,785 |
| | Bought | 7 | 97.65 | 140 | (101,402) |
| | | | | | ( 8,617) |

| 11/15 | Sold | 8 | 97.53 | 160 | 99,640 |
| | Bought | 8 | 97.65 | 160 | (109,469) |
| | | | | | ( 9,856) |

---

Opening Trade:

| 9/25 | Bought | 40 | 97.53 | 800 | (902,320) |
| | Sold | 40 | 97.65 | 800 | 924,280 |
| | | | | | 21,960 |

Closing Trade:

| 11/9 | Sold | 40 | 97.53 | 800 | 610,640 |
| | Bought | 40 | 97.65 | 800 | (659,840) |
| | | | | | ( 49,200) |

---

Opening Trade:

| 9/26 | Bought | 16 | 97.50 | 320 | (354,128) |
| | Sold | 16 | 97.625 | 320 | 363,968 |
| | | | | | 9,840 |

Closing Trades:

| 11/9 | Sold | 8 | 97.50 | 160 | 119,752 |
| | Bought | 8 | 97.625 | 160 | (129,984) |
| | | | | | ( 10,232) |

| 11/12 | Sold | 4 | 97.50 | 80 | 54,928 |
| | Bought | 4 | 97.625 | 80 | (60,052) |
| | | | | | ( 5,124) |

| 11/13 | Sold | 4 | 97.50 | 80 | 53,508 |
| | Bought | 4 | 97.625 | 80 | (58,628) |
| | | | | | ( 5,120) |

---

Opening Trade:

| 10/2 | Bought | 26 | 97.45 | 520 | (516,282) |
| | Sold | 26 | 97.51 | 520 | 523,129 |
| | | | | | 6,838 |

Closing Trades:

| 11/9 | Sold | 8 | 97.50 | 160 | 159,203 |
| | Bought | 8 | 97.625 | 160 | (166,188) |
| | | | | | ( 6,985) |

| 11/12 | Sold | 4 | 97.50 | 80 | 132,360 |
| | Bought | 4 | 97.625 | 80 | (138,720) |

|        |        |   |        |     | (  6,360) |
|--------|--------|---|--------|-----|-----------|
| 11/13  | Sold   | 4 | 97.50  | 80  | 58,300    |
|        | Bought | 4 | 97.625 | 80  | (61,480)  |
|        |        |   |        |     | ( 3,180)  |

---

Opening Trade:

|       |        |   |       |     |           |
|-------|--------|---|-------|-----|-----------|
| 10/3  | Bought | 8 | 97.45 | 160 | (158,344) |
|       | Sold   | 8 | 97.51 | 160 | 160,520   |
|       |        |   |       |     | 2,176     |

Closing Trade:

|       |        |   |       |     |           |
|-------|--------|---|-------|-----|-----------|
| 11/4  | Sold   | 8 | 97.45 | 160 | 99,680    |
|       | Bought | 8 | 97.51 | 160 | (104,768) |
|       |        |   |       |     | ( 5,088)  |

APPENDIX D

TANDRILL'S 1979 PUT OPTION SPREAD TRANSACTIONS
THROUGH ARBITRAGE MANAGEMENT

In all of the transactions below, the expiration date for the option was March 26, 1980, and the issuance date of the underlying Treasury bill was June 24, 1980.

| Trade Date | Type | No. | Trade | Commission | Cash Flow |
|---|---|---|---|---|---|
| **Opening Trade:** | | | | | |
| 10/30 | Bought | 25 | 97.16 | 500 | $(1,464,975) |
|  | Sold | 25 | 97.08 | 500 | 1,454,325 |
|  |  |  |  |  | (    10,650) |
| **Closing Trades:** | | | | | |
| 11/20 | Sold | 13 | 97.16 | 260 | 632,736 |
|  | Bought | 13 | 97.08 | 260 | (629,148) |
|  |  |  |  |  | 3,588 |
| 11/21 | Sold | 10 | 97.16 | 200 | 488,370 |
|  | Bought | 10 | 97.08 | 200 | (485,270) |
|  |  |  |  |  | 3,100 |
| 11/23 | Sold | 2 | 97.16 | 40 | 96,602 |
|  | Bought | 2 | 97.08 | 40 | (96,122) |
|  |  |  |  |  | 480 |

| Trade Date | Type | No. | Trade | Commission | Cash Flow |
|---|---|---|---|---|---|
| **Opening Trade:** | | | | | |
| 10/31 | Bought | 24 | 97.16 | 480 | (1,389,744) |
|  | Sold | 24 | 97.08 | 480 | 1,380,192 |
|  |  |  |  |  | (     9,552) |
| **Closing Trade:** | | | | | |
| 11/19 | Sold | 24 | 97.16 | 480 | 1,191,840 |
|  | Bought | 24 | 97.08 | 480 | (1,184,712) |
|  |  |  |  |  | 7,128 |

# APPENDIX E

## TRADE ANALYSIS

| DATE | TRADE TYPE | TRADE | DAYS TO EXPIRATION | UNDERLYING PRICE | INTEREST RATE | SPREAD PRICE | MAXIMUM SPREAD VALUE | SPREAD VALUE RANGE |
|------|------------|-------|--------------------|------------------|---------------|--------------|----------------------|--------------------|
| 9/20/79 | Spread Sale | +47 97.50P -47 97.625P | 76 | 97.45 | 10.21 | 25,004 | 58,750 | 32,638–50,553 |
| 9/24/79 | Spread Sale | +41 97.53P -41 97.65P | 72 | 97.50 | 10.02 | 21,525 | 49,200 | 26,786–41,143 |
| 9/25/79 | Spread Sale | +40 97.53P -4097.65P | 71 | 97.48 | 10.08 | 21,960 | 49,200 | 26,744–41,508 |
| 9/26/79 | Spread Sale | +16 97.50P -16 97.625P | 70 | 97.45 | 10.21 | 9,840 | 20,000 | 11,184–17,399 |
| 10/2/79 | Spread Sale | +26 97.45P -26 97.51P | 64 | 97.41 | 10.38 | 6,838 | 15,600 | 8,357–12,246 |
| 10/3/79 | Spread Sale | + 8 97.45P - 8 97.51P | 63 | 97.40 | 10.40 | 2,176 | 4,800 | 2,605–3,928 |
| 11/7/79 | Spread Purchase | -33 97.50P +33 97.625P | 28 | 96.88 | 12.50 | 42,174 | 41,250 | 38,976–40,856 |
| 11/8/79 | Spread Purchase | -14 97.50P +14 97.625P | 27 | 96.89 | 12.45 | 17,906 | 17,500 | 16,551–17,340 |
| 11/9/79 | Spread Purchase | -40 97.53P +40 97.65P | 26 | 97.01 | 11.98 | 49,200 | 48,000 | 44,316–47,592 |
| 11/9/79 | Spread Purchase | - 8 97.50P + 8 97.625P | 26 | 97.01 | 11.98 | 10,232 | 10,000 | 9,135–9,915 |
| 11/9/79 | Spread Purchase | -11 97.45P +11 97.51P | 26 | 97.01 | 11.98 | 6,985 | 6,600 | 5,800–6,544 |
| 11/12/79 | Spread Purchase | -20 97.53P +20 97.65P | 23 | 97.00 | 12.00 | 24,620 | 24,000 | 22,526–23,819 |
| 11/12/79 | Spread Purchase | - 4 97.50P + 4 97.625P | 23 | 97.00 | 12.00 | 5,120 | 5,000 | 4,649–4,962 |
| 11/12/79 | Spread Purchase | -10 97.45P +10 97.51P | 23 | 97.00 | 12.00 | 6,360 | 6,000 | 5,389–5,955 |
| 11/13/79 | Spread Purchase | - 6 97.53P + 6 97.65P | 22 | 97.00 | 12.00 | 7,392 | 7,200 | 6,787–7,148 |
| 11/13/79 | Spread Purchase | - 4 97.50P + 4 97.625P | 22 | 97.00 | 12.00 | 5,120 | 5,000 | 4,671–4,964 |
| 11/14/79 | Spread Purchase | - 7 97.53P + 7 97.65P | 21 | 96.95 | 12.20 | 8,617 | 8,400 | 8,055–8,341 |
| 11/14/79 | Spread Purchase | - 8 97.45P + 8 97.51P | 21 | 96.95 | 12.20 | 5,088 | 4,800 | 4,457–4,766 |
| 11/15/79 | Spread Purchase | - 8 97.53P + 8 97.65P | 20 | 97.08 | 11.70 | 9,856 | 9,600 | 8,884–9,539 |
| 11/15/79 | Spread Purchase | - 5 97.45P + 5 97.51P | 20 | 97.00 | 12.00 | 3,180 | 3,000 | 2,710–2,978 |
| 10/30/79 | Spread Purchase | +25 97.16P -25 97.08P | 148 | 96.99 | 12.06 | 10,650 | 20,000 | 10,603–16,178 |
| 10/31/79 | Spread Purchase | +24 97.16P -24 97.08P | 147 | 96.96 | 12.15 | 9,552 | 19,200 | 10,422–16,439 |

APPENDIX E
(Continued)

TRADE ANALYSIS

| DATE | TRADE TYPE | TRADE | DAYS TO EXPIRATION | UNDERLYING PRICE | INTEREST RATE | SPREAD PRICE | MAXIMUM SPREAD VALUE | SPREAD VALUE RANGE |
|------|------------|-------|--------------------|--------------------|----------------|---------------|-----------------------|---------------------|
| 11/19/79 | Spread Sale | -24 97.16P +24 97.08P | 128 | 97.02 | 11.93 | 6,168 | 19,200 | 10,066–14,791 |
| 11/20/79 | Spread Sale | -13 97.16P +13 97.08P | 127 | 97.01 | 11.95 | 3,068 | 10,400 | 5,503–8,249 |
| 11/21/79 | Spread Sale | -10 97.16P +10 97.08P | 126 | 97.08 | 11.68 | 2,700 | 8,000 | 3,980–4,873 |
| 11/23/79 | Spread Sale | - 2 97.16P + 2 97.08P | 124 | 97.16 | 11.35 | 400 | 1,600 | 747–562 |